```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    ----------------------------------------x
 3  ROBERT BERGERON, individually and on
    behalf of all others similarly situated,
 4
                                Plaintiff,
 5
                                     Case No. 20-cv-00875
 6       -vs-

 7  GRINDR, INC.,

 8                              Defendant.

 9  ----------------------------------------x

10                              United States Courthouse
                                White Plains, New York
11
                                March 23, 2021
12                              10:02 a.m.

13                  ** VIA TELECONFERENCE **

14
    B e f o r e :
15                              HONORABLE KENNETH M. KARAS

16                              District Judge

17
    A P P E A R A N C E S :
18
    SHEEHAN & ASSOCIATES, P.C.
19       Attorneys for Plaintiff
         60 Cuttermill Road, Suite 409
20       Great Neck, New York 11021
    BY:  SPENCER SHEEHAN
21
    GORDON REES SCULLY MANSUKHANI, LLP
22       Attorneys for Defendant
         18 Columbia Turnpike N.
23       Florham Park, New Jersey 07932
    BY:  PETER G. SIACHOS
24

25
```

```
 1              THE CLERK:  This is 20-cv-875 Bergeron v. Grindr, Inc.
 2              Counsel for plaintiff, please state your appearance
 3  for the record.
 4              MR. SHEEHAN:  For the plaintiff, Spencer Sheehan,
 5  Sheehan & Associates, P.C.  Good morning, Your Honor.
 6              THE COURT:  Good morning.
 7              THE DEPUTY CLERK:  Counsel for defendant?
 8              MR. SIACHOS:  Good morning, Your Honor.  Peter Siachos
 9  with Gordon Rees on behalf of defendant, Grindr.
10              THE COURT:  All right.  Good morning.
11              All right.  So we are gathered here telephonically for
12  argument on defense motion to compel arbitration, or in the
13  alternative, to dismiss.  I have had plenty of opportunity to
14  read the papers, so I thank you for that.  So it's the defense's
15  motion.  The digital floor is yours.
16              MR. SIACHOS:  Thank you, Your Honor.  I appreciate it.
17              Your Honor, I first want to focus on the motion to
18  compel arbitration because I think it's fairly straightforward.
19  Your Honor has read the papers, but what I want to make sure
20  that is evident from the papers is just how conspicuous and
21  emphasized this arbitration clause is when a user signs up to
22  become a Grindr member.
23              Whether they are on the app or online, the first thing
24  that they see is -- on the very first page is an all bold, all
25  caps, the admonition that Section 21 of the agreement contains
```

```
 1  an arbitration clause, and it's written in plain English, the
 2  very first page of the terms and conditions.  Now that's -- Your
 3  Honor, you've heard a lot of these motions.  I've argued a lot
 4  of these motions.  I've got to say, this is the first time that
 5  I have actually seen it where on the first page, the very first
 6  thing you see in different writing, in emphasized writing is an
 7  admonition that there is an arbitration clause; and not only is
 8  there an admonition or a caveat there is an arbitration clause
 9  there, it has the section where it appears, Section 21, is
10  hyperlinked so if the user has a concern with that, if the user
11  wants to read it, it's so easy for them to find it.  It's not
12  like it's buried deep on page 23.  It's on the first page.  And
13  when they click on that hyperlink, it takes them to the
14  arbitration clause.
15          The arbitration clause itself, Your Honor, is as
16  mandatory as an arbitration clause can get.  It contains all the
17  magic words:  Must, shall, and whatnot that the user will
18  participate in arbitration.  So if we were in the olden days,
19  which Your Honor and I are old enough to remember probably,
20  before phones and, you know, all of these electronic arbitration
21  clauses, if we were in the olden days --
22          THE COURT:  Wait, wait, wait.  Hold on.  How old do
23  you think I am?  Before phones?
24          MR. SIACHOS:  Before iPhones, Your Honor.
25          THE COURT:  Okay.  All right.
```

1          MR. SIACHOS:  I am a little -- I am a little older

2    than most of the people on this call, so I like to make jokes

3    about that, but before iPhones and before the apps and before

4    clicking on the checkmarks, you know, even if we were to look at

5    this in the olden days -- and I am aging myself here, Your

6    Honor -- this would be highly enforceable.

7          But we get to -- fast forward to what, 2007, 2008,

8    iPhones come around, early 2010s, teens, Grindr and other apps

9    come about, and then we have something called clickwrap

10   arbitration or clickwrap terms and conditions, clickwrap

11   arbitration agreements.  And under Second Circuit law, unless

12   Your Honor wants to change that law, which it's very, very

13   established, these sort of arbitration clauses are routinely

14   enforced.  These sort of terms and conditions are routinely

15   enforced.  So when the user gets on Grindr, as Your Honor could

16   see from the flow of the screen shots from the app, again, first

17   thing they see, arbitration clause.  Click on it.  You can read

18   the arbitration clause, and then electronically these are

19   enforced routinely throughout the country, and especially in the

20   Second Circuit.

21          So -- and another thing, Your Honor, is it's not like

22   they have to click around to see this.  They can just scroll

23   through the actual terms and conditions as they appear on the

24   page and then "proceed" is in bright orange.  The next step is,

25   even after you click "proceed," it asks you:  Are you sure you

032321.1                          PROCEEDINGS                          5

1  want to proceed?  Do you really accept these terms and

2  conditions?  Do you really accept Grindr's arbitration clause?

3  And the answer is that they do, and this class representative

4  did.  It's undisputed they did.  They don't deny that they

5  accepted the arbitration clause.

6          Now, some of the arguments they make in opposition to

7  it is, well, they didn't have time to read all of this, and it's

8  really terrible what Grindr did selling, you know, their HIV

9  status and what may be in their chats and whatnot, but that's

10 not what -- that doesn't -- it's not dispositive at all of this

11 motion.  It doesn't matter what Grindr may have done later as to

12 whether the arbitration clause is enforceable or not.  If they

13 don't like what Grindr did, then go to arbitration and deal with

14 it and make a claim; but the argument that sort of surprised me

15 in their opposition was that the arbitration clause shouldn't be

16 enforced because what Grindr did is so terrible, and they

17 wronged the plaintiff and thereby wronged the class.

18          Speaking of class though, Your Honor, there is also a

19 class action waiver right next to the arbitration clause; not

20 that we necessarily need it because, as the Supreme Court said,

21 class actions can't proceed in arbitration.  But lest there be

22 any doubt, we have an arbitration clause.  We have a mandatory

23 arbitration clause.  We have a clickwrap that's routinely

24 enforced in the Second Circuit.  We have something that's very

25 clear here, and we have a class action waiver.

1           So the arbitration clause should be enforced.

2           There is one more case, Your Honor, that has -- that I

3     found last night that has been decided since our briefing

4     occurred, and if Your Honor would like, I could file a notice of

5     supplemental authority, but just if Your Honor would like to

6     take a gander at it, it's your colleague in the Second Circuit,

7     Judge Katherine Polk Failla, I believe that's how you pronounce

8     her name.

9           THE COURT:  Failla, Judge Failla.

10          MR. SIACHOS:  Yeah.  And the case is *Jampol*,

11    J-A-M-P-O-L, *versus Blink Holdings*, and that's 20-cv-2760.  The

12    Westlaw cite is 2020 Westlaw 7774400.  That's a December 30th,

13    2020 decision; and in that case, it's very similar.  It's a

14    clickwrap case.  Judge Failla, she compelled arbitration in that

15    case, and it's really interesting because of this:  In that

16    case, the user went to a kiosk at a gym.  One of those like, you

17    know, like you see at the airport when you check in, a kiosk

18    with a touch screen; and the arbitration clause was not only far

19    less conspicuous in that case, which is evident from the

20    complaint and the case and everything, but the arbitration

21    clause didn't even -- didn't even apply to the agreement at

22    issue, and Judge Failla found that that arbitration clause still

23    applied.  She still compelled arbitration.

24          So we have a case, a very recent case, with another

25    clickwrap sort of arbitration clause not as conspicuous as this

1  one where it was in a kiosk where somebody was at a gym trying

2  to sign up.  Certainly, they didn't have much time to read it

3  there, certainly not as much time as they would sitting at their

4  home in the comfort of their home with their iPhone, and clicked

5  on it, and the court found that it was enforceable.

6          Notably, one more thing I wanted to add, Your Honor,

7  about this arbitration clause was that the word "arbitration" is

8  mentioned on nine different pages of this 30-page terms and

9  conditions.  It's mentioned several times on the first page.

10 It's mentioned 34 times total in the agreement.  It's very

11 difficult for the plaintiff to argue that this wasn't

12 conspicuous enough.  Failure to read it is not an excuse.  And,

13 Your Honor, we believe that, at a minimum, cases are dismissed

14 pursuant to Rule 12(b)(6), that arbitration should be compelled.

15         And I will a pause, Your Honor, if you want my

16 adversary to have a chance to respond or I can move on to the

17 12(b)(6) motion.  Your choice, Your Honor.

18         THE COURT:  That's a good idea.  Why don't we pause

19 and let plaintiffs respond to the arbitration issue?  So why

20 don't you stand by?

21         MR. SHEEHAN:  Thank you.  Sheehan, Spencer for the

22 plaintiff.

23         Thank you, my colleague or my adversary, either.  I

24 appreciate your words about the arbitration.

25         Anyway, Your Honor, much of what my adversary says is

1 factually true with respect to the layout of the screens and the

2 prompts and the click-throughs.  Although, of course, plaintiff

3 disagrees with the legal analysis.

4        So specifically, as noted in the complaint, plaintiff

5 has alleged that in order to read all of the terms of service

6 and privacy policies of the one company, MoPub and its partners,

7 it would be physically impossible to do because they would be

8 logged out of the Grindr application, and that is sort of an

9 impossibility, I guess, the exception that would render the

10 arbitration clause unenforceable.  That's the most obvious or at

11 least the most significant argument.

12        There are public policy issues, as my adversary noted,

13 at least that about with respect to which information Grindr

14 discloses, but that information is not essential, per se, to

15 adjudication of this motion to compel arbitration.  Perhaps it

16 imposes a higher standard on Grindr.  I believe that it does.

17        But the main issue here, the most compelling against

18 this motion to compel arbitration is that it is impossible to

19 comply with all of the linked agreements because the app will

20 time out, and they will have to go through it again.  They will

21 never be able to get through all of the application or through

22 the terms of service and also read all of the linked terms of

23 services.

24        So that is the most important and most significant

25 argument.  I could, you know, tell cases where the courts maybe

1    have not gone along with arbitration agreements.  There was a

2    First Circuit decision.  That's in the First Circuit, but any --

3    you know, case that I tell Your Honor, Your Honor is going to

4    make your decision based on your understanding of the law and

5    facts, and there are issues with respect to the Android phones

6    versus the Apple phones that were mentioned in this complaint,

7    but those aren't really central to this issue.

8             The issue is based on impossibility of compliance with

9    the arbitration clause in the agreement, and I don't think

10   defendant has refuted that point.  Although, I'm sure that

11   defendant may choose to point out something about it now, and

12   that's fine, but in the interest of being brief, I think that's

13   the main point the plaintiff will make.

14            THE COURT:  Okay.  All right.  Thank you very much.

15            Is there a defense reply to that?

16            MR. SIACHOS:  Very brief, Your Honor.  This is Peter

17   Siachos speaking.

18            The plaintiff seems to think that if he wanted to read

19   all of the other terms and conditions, that he has to do so

20   within a prescribed period of time, and that if somehow the

21   Grindr app won't stay on that long, then he is out of luck.  But

22   there is nothing preventing the plaintiff from going to read all

23   of the other terms and conditions and going back to Grindr and

24   hitting "I accept the terms of service."  And whether he did

25   read them or not -- we don't know that at this point, it doesn't

1   really matter -- the user, the plaintiff, the class

2   representative, he clicked a link or he clicked a box that said

3   that he has read, understood and agreed to be bound by the terms

4   of the agreement.

5           And then after that, that's, Your Honor, in the

6   declaration of Rodolfo Elizondo, which is docket 11, Exhibit 1.

7   And after that, the terms of service say, if you do not agree to

8   this agreement, then please cease using the Grindr services

9   immediately.  He agreed to it, whether he read it or not.  We

10  cite the cases in our brief, Your Honor.  Doesn't matter.  He

11  agreed to it.  The impossibility that -- even if you want to

12  take their allegations as being true -- the impossibility of his

13  ability to read everything before the Grindr app logs him out,

14  well, then go back and log in again.  But it's just not

15  plausible, Your Honor.

16          So we think it's clear that arbitration does apply

17  here.  There is a presumability of arbitration under the FAA and

18  the case law, and we hope that Your Honor will compel

19  arbitration.

20          THE COURT:  All right.  Anything else from plaintiff's

21  standpoint on this issue?

22          MR. SHEEHAN:  One final point, Sheehan, Spencer for

23  the plaintiff.  Yes, Siachos makes a good point about, yes, the

24  plaintiff could presumably log out and then log back in.

25  However, because of the numerous terms of service policies and

1   their possibility of, you know, that all of them, you know, may

2   not be identical at the same time the plaintiff would choose to

3   log in, plaintiff submits that it's an obstacle to informed

4   compliance and supports the impossibility of the plaintiff's

5   compliance.  So that's all.

6              THE COURT:  Okay.  All right.  Anything else from the

7   defense standpoint?

8              MR. SIACHOS:  Very briefly.  Peter Siachos here.

9              There is one term of service that matters here, and

10  it's Grindr's terms of service.  It's attached to the -- at

11  docket 6, at 6-1 and 6-2.  It's the only one that matters.

12             Whether, you know, if the plaintiff wants to go read

13  another one and doesn't agree to them, I don't know what that

14  has to do with anything; but he agreed to the one term of

15  service that matters, the one term of service that has the

16  arbitration clause in it, and that's the end of the story.

17             THE COURT:  All right.  Anything else from plaintiff

18  on this issue?

19             MR. SHEEHAN:  No, Your Honor.  Thank you.

20             THE COURT:  Okay.  So I will be honest.  I actually

21  think that the arbitration issue is fairly clean, and so I'm

22  just going to go ahead and give you my ruling on that.

23             So the brief background here is that plaintiff filed

24  the complaint against Grindr back in January of 2020.  It's a

25  class action on behalf of plaintiff and others who are alleged

1  users of the application on devices running Google's Android

2  operating system who used the service allegedly under "the false

3  impression regarding disclosure of their private information

4  without their consent" in New York and 49 other states.

5          Plaintiff alleges violations of GBL Sections 349 and

6  350 for deceptive acts or practices and false advertising,

7  respectively.  Plaintiff also brings claims against defendant

8  for violations of New York Civil Rights Law Section 51 and

9  claims of trespass to chattels, intrusion upon seclusion, breach

10  of contract, negligence and unjust enrichment.  As I said,

11  before the Court is the motion to compel arbitration or, in the

12  alternative, to dismiss.

13          In terms of some of the more relevant factual

14  allegations, relevant at least to the pending motion, so at

15  paragraph 1 Grindr is described as "the world's largest social

16  networking app for gay, bi, trans and queer people."  And at

17  paragraph 12 of the complaint alleges that plaintiffs and other

18  users being "members of groups which have been discriminated

19  against, have no other option in the marketplace" other than

20  using Grindr since "real competitors do not exist."

21          The complaint also alleges that defendant has a unique

22  role as a private company which has created a place where "users

23  can feel comfortable with their sexual orientation without fear

24  of discrimination or violence."

25          So the complaint describes that to monetize this app,

1  defendants partnered -- defendant partners with a supply-side

2  platform, an SSP I will call it, to install software development

3  kits on a user's app and phone.  The app includes SDKs, the

4  software development kits, for multiple advertising technology

5  companies, most significantly is MoPub, which is owned and

6  operated by Twitter.

7          Once the defendant's app is open, the SDK gathers data

8  from a user's phone.  Through MoPub, the user's identity can be

9  determined, and MoPub packages and provides this data to

10  advertisers, so-called the demand-side platforms, or DSPs.  This

11  is all laid out at paragraphs 7 and 8 of the complaint.

12          The DSPs add the data supplied by MoPub for their own

13  profile of the user.  The DSPs then engage in realtime bidding,

14  and the winner displays ads to the user.  That's from paragraphs

15  9 and 10.

16          Like many applications, the use of the defendant's app

17  begins with a -- and I will put it in quotes -- "consent form,"

18  and a privacy policy.  This is paragraph 11.  The policy -- the

19  privacy policy "only informs users of one of a dozen advertising

20  partners, MoPub, and directs them to independently review only

21  MoPub's privacy policy."  Paragraph 13.

22          Defendant instructs its users to "read the policies of

23  MoPub's more than 160 partners prior to indicating their

24  consent."  Paragraph 14.

25          Plaintiff alleges that it is "physically impossible to

1   read all of these privacy policies prior to indicating consent

2   because defendant's app will close automatically within that

3   time period making compliance impossible."  Paragraph 15.

4           Plaintiff also alleges that plaintiff and other users

5   are "unable to consent and make an informed choice about using

6   defendant's app and are not informed defendant sells its most

7   private and sensitive information."  Paragraph 16.

8           Unlike on Apple iPhones, the setting to "opt out of

9   interest based ads" on the Google Android phones are allegedly

10  "difficult to engage and locate."  That's paragraph 18.

11          And the plaintiff cites the 2016 report that talks

12  about how less than 17 percent of consumers had actually used

13  the setting, although 30 percent erroneously thought they had

14  opted out."  That's paragraph 19.

15          Settings on Android allows apps to continue to use

16  advertising ID for purposes -- for other purposes when a user

17  affirmatively opts out of personalized advertising, again,

18  according to plaintiff.  That's paragraph 20.  But on Apple

19  devices, this ability to opt out is unavailable.  That's

20  paragraph 21.

21          According to plaintiff, defendant "does not respect

22  the choices of users who opt out of sharing those details

23  through its own actions or through facilitating the actions of

24  its advertising partners."  Paragraph 23.

25          And according to plaintiff, there were a number of --

1  there is a wide variety, I should say, of personal and sensitive

2  information that was disclosed and auctioned off to third

3  parties without plaintiff's consent, including all types of

4  personal information:  Age, height, ethnicity, relationship

5  status, personal information like HIV status, location data,

6  email addresses, et cetera.

7        And because, according to plaintiff, defendant's

8  services targeted toward groups which have been victims of hate

9  crimes and discrimination, the nondisclosure or the disclosure

10  practice shocks the conscience of the plaintiff and the proposed

11  class.  So the proposed class is made up of individuals who

12  would have a reasonable expectation of privacy in personal chat

13  messages with other users and the personal information that's

14  described elsewhere in the complaint.  That's roughly from

15  paragraph 29 of the complaint.

16        Now, I think turning away from the complaint just for

17  this one point here is the defense does provide images of how

18  exactly the terms and conditions of service appear on the

19  website, and there's specific imaging of Section 21, which is

20  the arbitration provision.

21        So in terms of the legal analysis, starting with the

22  standard of review, this is a question of arbitrability, that

23  is, whether the parties have submitted this particular dispute

24  to arbitration; and the question of arbitrability is "a term of

25  art covering disputes about whether the parties are bound by a

1 given arbitration clause, as well as disagreements about whether

2 an arbitration clause in a concededly binding contract applies

3 to a particular type of controversy."  That's from *Pincaro*

4 *versus Glassdoor, Inc.*, 2017 Westlaw 4046317 at star 5.  Quoting

5 from the Supreme Court in *Howsam*, 537 U.S. at 84.

6         To answer this question, the Second Circuit instructs

7 that lower courts are to follow a two-part test, which means

8 first, whether the parties have entered into a valid agreement

9 to arbitrate; and if so, second, whether the dispute at issue

10 comes within the scope of the arbitration agreement.  That's

11 from *In Re:  American Express Financial Advisors Securities*

12 *Litigation*, 672 F.3d 113 at 128.  That's from the Second Circuit

13 in 2011.

14         "The law generally treats arbitrability as an issue

15 for judicial determination unless the parties clearly and

16 unmistakably provide otherwise."  That's from *NASDAQ OMX Group*

17 *Inc. versus UBF Securities, LLC*, 770 F.3d 1010 at 1031.  That's

18 a Second Circuit decision, also quoting from *Howsam* at page 83.

19         Now, with respect to this question, "the proper

20 inquiry is whether there is clear and unmistakable evidence from

21 the arbitration agreement as construed by the relevant state law

22 that the parties intended that the question of arbitrability

23 shall be decided by the arbitrators."  That's from *Bernstein*

24 *Investment Research and Management, Inc. versus Schaffran*, 445

25 F.3d 121 at 125.  If such evidence exists, then the Court shall

1  apply an arbitration clause or agreement to "all disputes within

2  its scope unless...the validity challenge is to the

3  [arbitration] clause itself or...the party disputes the

4  formation of the contract."  That's from *Doctor's Associates,*

5  *Inc. versus Kirksey,* 2018 Westlaw 6061573 at star 4.  It's a

6  District of Connecticut decision.

7          "When...parties explicitly incorporate rules that

8  empower an arbitrator to decide issues of arbitrability, the

9  incorporation serves as clear and unmistakable evidence of the

10  parties' intent to delegate such issues to an arbitrator."

11  That's *Contec Corp. versus Remote*.  So I'm just -- I am just

12  going with *Contec Corp.*, 398 F.3d 205 at 208, which is a Second

13  Circuit decision from 2005.

14          Now, the Federal Arbitration Act, the FAA, provides

15  that an arbitration agreement "shall be valid, irrevocable and

16  enforceable, save upon such grounds as exist at law or in equity

17  for the revocation of any contract."  That's from 9 U.S.C.

18  Section 2.

19          The FAA "embodies the national policy favoring

20  arbitration and places arbitration agreements on equal footing

21  with all other contracts."  That's *Buckeye Check Cashing, Inc.*

22  *versus Cardegna*, 546 U.S. 440 at 443.  However, "the FAA does

23  not require parties to arbitrate when they have not agreed to do

24  so."  That's *Nicosia versus Amazon.com, Inc.*, 834 F.3d 220 at

25  229.  It's a Second Circuit decision from 2016.

1          Before determining who decides arbitrability, the

2   Court has to determine the initial validity of the agreement to

3   arbitrate.  So -- and that doesn't seem to be disputed here, but

4   I will just note that that's what the Supreme Court said in

5   *Henry Schein*, 139 S.Ct. at 530.

6          So because arbitrability is a question for the Court,

7   the Court turns to the contract formation as it relates to the

8   validity of the arbitration clause.  When "a party challenges

9   the formation or execution of the contract, it is the Court's

10  role to determine whether a contract exists."  That's from

11  *Nicosia versus Amazon*, 2017 Westlaw 10111078 at star 16,

12  footnote 32.  So, for example, courts have to resolve challenges

13  to issues of a contract's formation and challenges "directed

14  specifically to the validity of...delegation provisions

15  themselves."  That's *Doctor's Associates* at star 4.  "In cases

16  such as this, where the purported assent is largely passive, the

17  contract-formation question will often turn on whether a

18  reasonably prudent offeree would be on inquiry notice of the

19  term at issue."  That's from *Specht versus Netscape*

20  *Communications Corp.*, 306 F.3d 17 at 27.  That's the Second

21  Circuit decision from 2002.

22          To be bound by an online contract, "an Internet user

23  need not actually read the terms and conditions."  That's from

24  *Nicosia* at 232.  Nor must the user "click on the hyperlink that

25  makes them available."  Also from *Nicosia* at 232.  Instead, the

1  key inquiry is whether the user had notice of the existence of

2  the terms.

3            So I think we all agree that the terms of service here

4  is a -- is what's known as a "clickwrap agreement," which is not

5  in dispute; and that's described, among other cases,

6  *Register.com versus Verio, Inc.*, 356 F.3d 393 at 429.

7            All right.  So the first question is the validity of

8  the contract and thus the arbitration clause.  So in order to

9  use the defendant's app, the plaintiff had to agree to

10 defendant's terms, which is the first -- which is the default

11 first screen presented to a user when using the app.  And the

12 terms state that claims in this dispute "must be asserted

13 individually in binding arbitration."  Other language that's

14 displayed to plaintiff before using the app include -- and this

15 is off the first screen.  It's displayed in all caps, and I am

16 just going to read what it says in all caps, "READ [THE TERMS OF

17 SERVICE] CAREFULLY.  BY ACCESSING, DOWNLOADING, USING,

18 PURCHASING AND/OR SUBSCRIBING TO THE GRINDR SERVICES, YOU

19 ACKNOWLEDGE" -- and this is in bold -- "YOU ACKNOWLEDGE THAT YOU

20 HAVE READ, UNDERSTOOD AND AGREED TO BE BOUND BY THE TERMS OF

21 THIS AGREEMENT.  IF YOU DO NOT AGREE TO THIS AGREEMENT, THEN

22 PLEASE CEASE USING THE GRINDR SERVICES IMMEDIATELY."  And

23 that's, as I said, in all caps.

24            And, actually, the bold is something I -- I take that

25 back.  The bold is not in there, but what is in there

1  unequivocally is that this first reading that displays on the

2  full screen is all caps.  So what I read to you is all caps.

3          Also, the screen says, "You and Grindr agree that any

4  dispute that has arisen or may arise between us relating in any

5  way to your use or access -- your use of or access to the Grindr

6  services, any validity, interpretation, breach, enforcement or

7  termination of this agreement or otherwise relating to Grindr in

8  any way...will be resolved in accordance with the" -- and I will

9  put in brackets -- "[the arbitration clause]" which is 21.  So

10 close the bracket.

11         It also says, "any covered dispute matter must be

12 asserted individually in binding arbitration."

13         Then in all caps, "THE" -- and then I will just put in

14 brackets "[arbitration clause] WILL...REQUIRE DISPUTES BETWEEN

15 YOU AND US TO BE SUBMITTED TO BINDING AND FINAL ARBITRATION

16 UNLESS YOU OPT OUT."

17         All caps.  "BY AGREEING TO THIS AGREEMENT, YOU HEREBY

18 IRREVOCABLY WAIVE ANY RIGHT YOU MAY HAVE (i) TO A COURT TRIAL,"

19 and then I will put in brackets, "[AND] TO PARTICIPATE AS A

20 MEMBER OF A CLASS."  And again, that is all caps.

21         So by downloading the app, plaintiff acknowledged that

22 he "had read, understood, and agree[d] to be bound by" Grindr's

23 terms of service, which clearly included the arbitration clause

24 and class action waiver.  But again, I'm just more focused on

25 the arbitration clause.

1          The language, you know, it's a phrase that gets used a

2     lot, "in plain English," but that's important here because it is

3     plain English.  There is no archaic legalese, and it is in plain

4     language that the user was urged to read carefully the terms of

5     service.  And, in fact, to advance through the Grindr app,

6     users, including plaintiff, affirmatively had to click the

7     "proceed" button, which triggers a digital prompt offering a

8     user a choice between cancel or accept.  And there is no

9     allegation here that plaintiff opted out of the arbitration

10    clause or that he did not consent to the terms of service before

11    he began to use the app.

12          So that's relevant here because the Second Circuit has

13    made it abundantly clear that "an electronic click can suffice

14    to signify the acceptance of a contract...as long as the layout

15    and language of the site give the user reasonable notice that a

16    click will manifest assent to an agreement."  That's *Meyer*

17    *versus Uber Technologies, Inc.*, 868 F.3d 66 at 75, and that's a

18    2017 case, comfortably long after telephones were invented.

19          So as I said, here the language is clear.  It's

20    explicit.  It's prominently placed on the screen.  It's the very

21    first screen.  It is in all caps to bring to the user's

22    attention all of the Grindr terms of service.  And so, not

23    surprisingly, district courts have routinely upheld these types

24    of clickwrap agreements.  You know, agreements which require the

25    user to click on an "I agree" or, you know, "I consent" after

1  being presented with a terms of use, for the principal reason

2  that the user has affirmatively assented to the terms of the

3  agreement by clicking "I agree."

4        So among the cases -- I didn't give the full cite

5  earlier -- but it's *Fteja*, 841 F. Supp. at 837.

6        So "while new commerce on the Internet has exposed

7  courts to many new situations, it does not fundamentally change

8  the principles of contract."  That's *Register.com* at 403.

9  "Mutual manifestation of assent" remains a touchstone of

10 contract formation.  The creation of a contract would rest on

11 the manifestation of an agreement between the parties in

12 accordance with state law principle.  That's from *Specht* at

13 pages 28 through 29.  The Court finds here that there was a

14 manifestation of an agreement between the parties, and there is

15 a valid contract because plaintiff was clearly presented with

16 Grindr's terms and clicked "proceed" and then "accept."  And the

17 agreement includes the arbitration clause.

18        And that finding includes the finding that the display

19 and language in the terms of service gave plaintiff more than

20 reasonable notice that by clicking "accept," the plaintiff

21 manifested his assent to the terms, including the arbitration

22 clause.

23        Now, similar results were found in *Meyer* at 868 F.3d

24 at 75, and *Feldman* at 513 F.Supp.2d at 237, and under New York

25 law "a party's failure to read or understand a contract that it

1  signs does not relieve it of its obligation to be bound by the

2  contract."  That's from *In re:  Lehman Brothers, Inc.*, 478 B.R.

3  570 at 587, footnote 19.

4          Now, as plaintiff points out, courts look to whether

5  the terms were obvious and whether such terms were called to the

6  offeree's attention.  That's from *Starke versus Squaretrade,*

7  *Inc.*, 913 F.3d 279 at 288.  Here, the Court finds that the terms

8  were obvious and did call them to plaintiff's attention.  When

9  plaintiff created the account on defendant's app, Grindr's terms

10 of service were presented to plaintiff in all caps as the first

11 screen he viewed before being able to use the app, and with the

12 requirement of clicking "accept" to Grindr's terms and

13 conditions of service, which, as I said, include the arbitration

14 clause.

15         Plaintiff was also presented with the option to

16 cancel, but chose not to do so, and proceeded while on notice of

17 Grindr's terms.

18         Now, plaintiff does argue at page 4 of his memorandum

19 that defendant did not provide him with "easy access to the

20 terms and conditions," but that's, frankly, a conclusory

21 allegation that's belied by, as I said, the clear and obvious

22 display of the terms on the very first screen presented to

23 plaintiff.

24         You know, plaintiff also makes the argument at page 6

25 that no reasonable consumer would or could read all of these

1  policies, but that's not the inquiry.  The inquiry is not

2  whether the consumer actually read the terms, but instead

3  whether they had notice of the existence of the terms; and by

4  plaintiff's own acknowledgment in the complaint, plus with how

5  all of this is presented and what the user has to do in terms of

6  assenting, it's clear that plaintiff did have such notice.

7         So because the Court finds that Grindr's terms were,

8  not only reasonably, but clearly communicated to plaintiff, and

9  that plaintiff assented to such terms, the contract, which

10 includes the arbitration clause, is valid.

11        So next is the issue of whether the dispute here falls

12 within the scope of the arbitration clause.  Now, federal policy

13 in favor of arbitration "requires that any doubts concerning the

14 scope of arbitrable issues be resolved in favor of arbitration."

15 That's *Telenor Mobile Communications AS versus Storm*, *LLC*, 584

16 F.3d 396 at 406.

17        The first step in this inquiry is whether a dispute

18 falls within the scope of an arbitration agreement is

19 classifying it as broad or narrow.  This is all spelled out in

20 *Louis Dreyfus Negoce S.A. versus Blystad Shipping and Trading*

21 *Inc.*, 252 F.3d 218 at 224.

22        "Broad clauses purport to refer all disputes to

23 arbitration.  Narrow clauses limit arbitration to specific types

24 of disputes."  That's a quote from *Camferdam v. Ernst & Young*

25 *International, Inc.*, 2004 Westlaw 1124649 at star 1.

1          So if the agreement is narrow, the Court has to

2  determine whether the issue is within the purview of that narrow

3  arbitration clause; and of course if the agreement is broad,

4  then a presumption of arbitrability attaches, and "arbitration

5  of even a collateral matter would be ordered if the claim

6  alleged 'implicates issues of a contract construction or the

7  parties' rights and obligations under it.'"

8          That's from a case -- I will just spell out the

9  plaintiff's name -- *S-E-R-E-B-R-Y-A-K-O-B* versus *Golden Touch*

10 *Transportation of New York, Inc.*, 2015 Westlaw 1359047 at star

11 14.

12         So the terms of service in 2018 and 2019 state, "You

13 and Grindr agree that any dispute that has arisen or may arise

14 between us relating in any way to your use of, or access to, the

15 Grindr services, any validity, interpretation, breach,

16 enforcement or termination of this agreement or otherwise

17 relating to Grindr in any way defined as ('covered dispute

18 matters') will be resolved in accordance with the provisions set

19 forth in this Section 21."  And 21 is the arbitration clause.

20         The arbitration clauses provide that the FAA governs

21 and applies in "all covered dispute matters" and in "all cases"

22 and that "any covered dispute matter must be asserted

23 individually in binding arbitration."

24         So I don't think it's a stretch to say that this

25 agreement is broad.  It contains the very type of expansive

1  language that is consistent in broad arbitration clauses, and

2  similar clauses have been found in many cases such as the *Louis*

3  *Dreyfus* case I mentioned earlier at 225.  I'll add another case,

4  which is *ACE Capital Overseas, Limited versus Central United*

5  *Life Insurance Company*, 307 F.3d 24 at 26, which had the sort of

6  "any dispute" type of language.

7          So where a Court finds that an arbitration agreement

8  is broad, it creates a presumption of arbitrability, as I

9  mentioned, and that's in -- so here, the language I think

10 clearly "evidences the parties' intent to have arbitration serve

11 as the primary recourse for disputes connected" in this case to

12 Grindr's terms of service.  That's from *Louis Dreyfus* at 225.

13         And further, in using language such as "any dispute,"

14 the terms of use contain no words of limitation applicable to

15 plaintiff's claim.  Specifically, the arbitration clause here

16 establishes that "any dispute" between plaintiff and defendant

17 regarding plaintiff's use of the app, which involves the terms

18 of service and/or "relating to Grindr in any way" is subject to

19 arbitration.

20         And here, there are only two exceptions:  Matters

21 involving intellectual property rights, and relief from small

22 claims court, and neither exception applies here.

23         In fact, Grindr even provides the user the opportunity

24 to opt out of the agreement to arbitrate, but there is no

25 allegation that that was done here.

```
 1            Thus, in the Court's view, the plaintiff's claims fall
 2   within the scope of the very broad arbitration clause, and
 3   therefore have to be arbitrated on an individual basis.  So for
 4   this reason, the motion to compel is granted.  The motion to
 5   dismiss is denied without prejudice as moot given the ruling on
 6   the arbitration.
 7            I will issue an order that basically says, for the
 8   reasons stated on the record, the motion to arbitrate is
 9   granted.
10            Is there anything else we can do for you all?
11            MR. SIACHOS:  From defendant's standpoint, nothing
12   further, Your Honor.  Thank you.
13            MR. SHEEHAN:  From the plaintiff's standpoint,
14   obviously, nothing further, Your Honor.  Thank you.
15            THE COURT:  All right.  Then enjoy the rest of the
16   day, and please stay healthy, everybody.  We are adjourned.
17            MR. SHEEHAN:  Thank you, Your Honor.
18            MR. SIACHOS:  Thank you, Your Honor.
19            (Time noted:  10:46 a.m.)
20
21
22
23
24
25
```